24CA0887 Peo in Interest of GWB 07-30-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0887
City and County of Denver Juvenile Court No. 23JD498
Honorable Elizabeth McCarthy, Judge

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of G.W.B.,

Juvenile-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE YUN
Lipinsky and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 30, 2026

---

Philip J. Weiser, Attorney General, Rachel Lieb, Assistant Attorney General II, Denver, Colorado, for Petitioner-Appellee

Megan A. Ring, Colorado State Public Defender, Rachel Z. Geiman, Deputy State Public Defender, Denver, Colorado, for Juvenile-Appellant

¶ 1    G.W.B. appeals his juvenile adjudication for criminal mischief and reckless endangerment. He contends that the district court erred by (1) denying his motion to suppress the victim's out-of-court identification and (2) subsequently allowing the victim to identify him in court. We affirm.

## I. Background

¶ 2    In April 2023, the victim drove from Kansas to Colorado Springs with his fiancee on a vacation to celebrate the impending birth of their daughter. As they neared Denver on Interstate Highway 70, the victim noticed a blue Jeep Liberty tailgating them. He saw two teenage boys in the Jeep, one driving and the other in the passenger seat. After a mile or two, the victim observed the passenger reach into the back and pull out a gun. Although the victim initially believed it was an assault rifle, he realized after about twenty seconds that there was a $CO_2$ tank attached to it and that it was more likely "a BB gun or a paintball gun."

¶ 3    The Jeep pulled alongside the victim's car on the left. The passenger rolled down the window, leaned out, and fired between twenty and forty shots at the victim's car, denting its side. The

1

boys in the Jeep then sped away, laughing and weaving through traffic.

¶ 4    The victim's fiancee called 911, and the victim explained to the 911 operator what had happened and reported the Jeep's license plate number.  The victim told police that the two individuals in the Jeep were young white men, about sixteen or seventeen years old — one with black hair, the other with brown.

¶ 5    Detective Jeremiah Johnson identified G.W.B. as the possible owner of the Jeep, obtained G.W.B.'s Division of Motor Vehicles photo, and used a computer program to create a six-photo array to present to the victim.  Because the victim had already returned to Kansas, Detective Johnson contacted a Kansas detective, Greg Jones, to administer the photo lineup.  The information provided by Detective Johnson to Detective Jones indicated which photo was G.W.B.'s.

¶ 6    Before presenting the array of photos to the victim, Detective Jones read him the following admonition:

> In a moment, I am going to show you a group
> of photographs.  This group of photographs
> may or may not contain a picture of the person
> who committed the crime now being
> investigated.  The fact that the photos are

being shown to you should not cause you to believe or guess that the guilty person has been caught. You do not have to identify anyone. It is just as important to free innocent persons from suspicion as it is to identify those who are guilty. The investigation of this crime will continue regardless of whether or not you make an identification. Please keep in mind that hair styles, beards, and moustaches are easily changed. Also, photographs do not always depict the true complexion of a person — it may be lighter or darker than shown in the photo. You should pay no attention to any markings or number that may appear on the photos. Also pay no attention to whether the photos are in color or black and white, or any other difference in the type or style of the photographs. You should study only the person shown in each photograph.

Detective Jones then handed all six photos to the victim. After about a minute, the victim selected G.W.B.'s photo, remarking that he was "pretty confident" of his selection, that he "had a pretty good look at" the shooter, and that the person in the photo looked "just like him." However, on the photo identification report, the victim marked that he was only "somewhat confident" in his identification.

¶ 7    The six photos comprising the array are depicted below.  The photo marked "2." depicts G.W.B.





The Six Photos Presented for Identification

¶ 8    Before trial, G.W.B. moved to suppress the out-of-court identification, arguing it resulted from an impermissibly suggestive photo array.  The district court denied the motion after an

evidentiary hearing. The court acknowledged "some concerns" about the small number of photos in the array, the victim's receipt of all the photos at once instead of one at a time, and Detective Jones's awareness of which photo depicted G.W.B. Nevertheless, the court found that, under the totality of the circumstances, the lineup was not impermissibly suggestive:

> [T]he photos match in age, race, gender, hair. We watched the video of the identification, and the Court did not see any tell or indication from Detective Jones that he knew that [G.W.B.] was the suspect or gave any indication to the [victim] that [G.W.B.] was the suspect. [The victim] stated he's pretty confident it's number two. "I had a pretty good look at him, and it looks just like him," and chose [G.W.B.'s] photo almost immediately from the lineup.

> And so the Court does not find that it is impermissibly suggestive. . . . I find that there are sufficient indications of reliability with the . . . lineup. Although there were some best practices that were not employed, the Court does find that as a whole, it does not violate the due process clause, and there is no substantial likelihood of irreparable misidentification.

¶ 9    G.W.B. also moved to suppress any in-court identification, but the district court denied that motion as well and allowed the victim to identify G.W.B. at trial. The victim testified that he could see the

5

Jeep's driver and passenger "clearly" while they were tailgating him and that, as soon as he saw the gun, he "paid full attention" to them. He testified that he was "100 percent confident" that G.W.B. was the shooter after "[s]eeing [G.W.B.'s] face right here" in the courtroom.

¶ 10    The district court found G.W.B. guilty of criminal mischief and reckless endangerment and sentenced him to nine months of probation.

¶ 11    G.W.B. now appeals.

## II.    Out-of-Court Identification

¶ 12    G.W.B. contends that the district court erred by denying his motion to suppress the victim's out-of-court identification, arguing that the photo array and identification procedures were impermissibly suggestive. We disagree.

### A.    Governing Law and Standard of Review

¶ 13    Colorado courts apply a two-part test to determine the admissibility of an out-of-court photographic identification. *Bernal v. People*, 44 P.3d 184, 191 (Colo. 2002). First, the defendant bears the burden of proving that the photo array was impermissibly suggestive. *Id.* Second, if the defendant meets this

6

burden, the burden shifts to the prosecution to show that the identification was nevertheless reliable under the totality of the circumstances. *Id.* Only if the court determines that the array was impermissibly suggestive is it necessary to reach the second step. *Id.*

¶ 14 At the first step, the court considers "a number of factors" when evaluating whether the photo identification procedure was impermissibly suggestive, including the size of the photo array, the manner of its presentation, and the details of the photographs themselves. *Id.*; *People v. Palacios*, 2018 COA 6M, ¶ 12. G.W.B. challenges the victim's out-of-court identification based on each of these factors, which we address below.

¶ 15 To avoid influencing the eyewitness's recollection, the photos in an array must not "differ[] significantly" from the eyewitness's initial description. *People v. Singley*, 2015 COA 78M, ¶ 20. The accused's photo also must not stand out from the "filler"[1] photos in a way that suggests it is more likely a photo of the culprit. *See*

---

[1] A "[f]iller" is "either a person or a photograph of a person who is not suspected of the offense in question and is included in an identification procedure." § 16-1-109(2)(d), C.R.S. 2025.

*Bernal*, 44 P.3d at 191.  But the police need not provide a photo array containing only "exact replicas" of the accused's photo.  *Id.* (citation omitted).  All that is required is that the photos match "by race, approximate age, facial hair, and a number of other characteristics."  *Id.* at 191-92 (citation omitted).

¶ 16     "If the court finds a photo array impermissibly suggestive, it must then proceed to the second step of the analysis and determine whether, under the totality of the circumstances, the suggestive procedure created a very substantial likelihood of misidentification."  *Id.* at 192.  To determine whether, despite a suggestive array, the identification was nonetheless reliable, the court considers the following factors:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

¶ 17     We review the constitutionality of a pretrial identification procedure as a mixed question of law and fact.  *Id.* at 190.  We defer

to the district court's findings of fact but review its legal conclusions de novo.  *Id.*  If error occurred, we apply constitutional harmless error review.  *Hagos v. People*, 2012 CO 63, ¶ 11.  Under this standard, we must reverse unless the error was harmless beyond a reasonable doubt.  *Id.*

## B.    Size of the Array

¶ 18    Although G.W.B. concedes that "a photo array with as few as six pictures is not per se a due process violation," *Bernal*, 44 P.3d at 191, he argues that the relatively small number of photos requires that we scrutinize the array more closely for "suggestive irregularities," *id.*  We agree on both counts.  While the six-photo array in this case did not necessarily create a due process violation, it does require us to closely examine both the array and the procedure used for any suggestive irregularities.  *Id.*

## C.    Manner of Presentation

¶ 19    G.W.B. argues that Detective Jones presented the array in an impermissibly suggestive manner because (1) the administration

was not "blind" or "blinded,"[2] and (2) all six photos were shown to the victim at once rather than one at a time. We are not persuaded.

¶ 20    Detective Jones testified that he was "unfamiliar with the . . . lineup" before presenting it to the victim but "might have read" the document indicating which photo was the suspect's "right then and there as [he] was giving" the photos to the victim. He testified that he did not in any way suggest which photo the victim should pick.

¶ 21    Consistent with this testimony, the district court found that Detective Jones's statements and actions while administering the photo array neither directed the victim nor influenced his identification. While a "blind" or "blinded" procedure is preferable, *see* § 16-1-109(3)(a)(II), C.R.S. 2025 (law enforcement agencies must adopt policies that include protocols "guiding the recommended use" of "blind" or "blinded" photo arrays), on this record we cannot say that the nonblind procedure rendered the

---

[2] A "[b]lind" procedure means "the administrator of a live lineup, photo array, or showup does not know the identity of the suspect," § 16-1-109(2)(a), while a "[b]linded" procedure means the administrator "may know who the suspect is but does not know in which position the suspect is placed in the photo array when it is viewed by the eyewitness," § 16-1-109(2)(b). We mean no disrespect to persons with visual impairments by using these statutorily defined terms.

photo array impermissibly suggestive. *See, e.g.*, *State v. Gholson*, 700 S.W.3d 613, 627 (Mo. Ct. App. 2024) (A nonblind lineup was not "impermissibly suggestive" when the detective "denied doing anything to suggest who [the witness] should identify, and there [wa]s nothing in the record [that] indicat[ed] otherwise.").

¶ 22 Further, no Colorado statute or case requires photo arrays to be presented sequentially rather than simultaneously. To the contrary, Colorado courts have upheld simultaneous six-photo arrays as not impermissibly suggestive. *See People v. Shanks*, 2019 COA 160, ¶ 51 (array of six photos "arranged in two rows of three" was not impermissibly suggestive); *People v. Wilford*, 111 P.3d 512, 514 (Colo. App. 2004) (defendant's position "in the middle of the top row" of six photos arranged in two rows of three was not impermissibly suggestive).

¶ 23 Finally, Detective Jones informed the victim that (1) the photo array might or might not contain a photo of the suspect; (2) he was not required to identify anyone; (3) the fact that the photos were being shown should not cause him to believe the guilty person had been caught; (4) it was just as important to free innocent persons from suspicion as to identify those who are guilty; and (5) the

investigation of the crime would continue regardless of whether or not he made an identification. These admonishments weigh in favor of a determination that the lineup was not impermissibly suggestive. *See People v. Whittiker,* 181 P.3d 264, 273 (Colo. App. 2006) (no due process violation where, among other considerations, the witness "was admonished in writing that she did not have to identify anyone and should make up her own mind").

## D. The Photos

¶ 24 G.W.B. argues that the photos themselves were impermissibly suggestive because (1) several of the other subjects look "critically different" from G.W.B. and from the victim's description of the shooter; and (2) G.W.B.'s photo is unique because his head appears larger in the frame, his photo has the lightest background, and his is one of only two photos with a blue background instead of a brown one. We disagree.

¶ 25 The victim described the two people in the Jeep as young white men, about sixteen or seventeen years old. G.W.B. argues that "it is not apparent from their photos" that all six subjects in the array are white; that subjects 5, 6, and possibly 3 "have some facial hair or scruff, while 1, 2, and 4 do not"; that 1, 2, and 4

appear to be teenagers, while the ages of 3, 5, and 6 are less clear; and that 3, 5, and 6 have noticeably longer faces than 1, 2, and 4. But a photo array need not contain only "exact replicas" of the accused's photo. *Bernal,* 44 P.3d at 191 (citation omitted). The record lists all the subjects as white, and Detective Jones informed the victim that photographs do not always depict a person's true complexion. Neither facial hair nor face shape was part of the victim's description. Additionally, none of the subjects' features are so suggestive that G.W.B.'s photo stands out in "stark contrast" to the others. *Id.* at 192.

¶ 26    We further conclude that the differences in framing, lighting, and background color did not render the array impermissibly suggestive. *See People v. Borghesi,* 66 P.3d 93, 104 (Colo. 2003) (differences in lighting and positioning of the defendant in his photograph that were not "connected to a specific, identifying feature of the defendant raised by any of the witnesses" did not render array impermissibly suggestive); *People v. Webster,* 987 P.2d 836, 839-40 (Colo. App. 1998) (differences in background color did not render array impermissibly suggestive).

¶ 27 Accordingly, the district court did not err by denying G.W.B.'s motion to suppress the victim's out-of-court identification. Because G.W.B. did not meet his burden under *Bernal*'s first step, we need not proceed to the second. *See Bernal*, 44 P.3d at 191.

## III. In-Court Identification

¶ 28 G.W.B. contends that, even if the photo array was not impermissibly suggestive, the district court nonetheless erred by allowing the victim's in-court identification without first assessing its reliability under the factors set forth in *Biggers*. Those factors include

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200.

¶ 29 G.W.B. acknowledges that the Colorado Supreme Court rejected this contention in *Garner v. People*, 2019 CO 19. Specifically, the court held that,

> where an in-court identification is not preceded by an impermissibly suggestive pretrial identification procedure arranged by

> law enforcement, and where nothing beyond the inherent suggestiveness of the ordinary courtroom setting made the in-court identification itself constitutionally suspect, due process does not require the trial court to assess the identification for reliability under *Biggers*.

*Id.* at ¶ 5. But G.W.B. argues that a *Biggers* analysis was warranted here because (1) the photo array was not administered in accordance with best practices; (2) the victim's increased certainty at trial suggested that his in-court identification was "tainted by the prior suggestive lineup"; and (3) the defendant in *Garner* was later exonerated, calling into question whether "upholding an in-court identification without a *Biggers* analysis will achieve justice." We are not persuaded that these circumstances render *Garner*'s holding inapplicable.

¶ 30     First, as discussed above, the administration of the photo array did not render it impermissibly suggestive.

¶ 31     Second, the victim's increased certainty at trial may have been due to seeing G.W.B. in person in the courtroom rather than in a photograph. As noted in Detective Jones's admonishment before he administered the photo array, a photo does not always perfectly capture a person's likeness. The victim testified that he saw the

15

boys in the Jeep "clearly" and "paid full attention" after seeing the gun. His increased certainty upon "[s]eeing [G.W.B.'s] face right [there]" in the courtroom thus does not necessarily make "the in-court identification itself constitutionally suspect." *Garner,* ¶ 5.

¶ 32 Third, the facts of this case are distinguishable from those in *Garner.* In *Garner,* the eyewitnesses who identified the defendant in court had been unable to identify him in a previous photo array. *See id.* at ¶ 3. Here, by contrast, the victim identified G.W.B. in the photo array almost immediately, remarking that he "had a pretty good look at" the shooter and that the photo he selected looked "just like him."

¶ 33 Under these circumstances, we conclude that the district court did not err by permitting the victim's in-court identification of G.W.B. without first assessing its reliability under the *Biggers* factors.

IV. Disposition

¶ 34 We affirm the judgment.

JUDGE LIPINSKY and JUDGE SCHUTZ concur.